**Bobby BATY and Judy Baty,
Respondents,**

v.

**Gail LAYTON and Kathy
Layton, Appellants.**

**No. 22555.**

Missouri Court of Appeals,
Southern District,
Division One.

Oct. 12, 1999.

Motion for Transfer to Supreme
Court Denied Nov. 3, 1999.

Application to Transfer Denied
Dec. 21, 1999.

Larry G. Luna, Branson, for appellants.

Randy S. Anglen, Branson, for respondents.

CROW, Presiding Judge.

In this court-tried case, the trial court awarded Plaintiffs, Bobby Baty and his wife, Judy Baty, a common law easement by necessity across land owned by Defendants, Gail Layton and his wife, Kathy Layton.

Defendants appeal, maintaining the trial court erred in that: (1) the common law implied an easement in favor of Plaintiffs across land retained by Plaintiffs' grantors

instead of across Defendants' land, and (2) alternatively, the easement awarded was too wide.

Bobby Baty is the brother of Kathy Layton. Their parents are Bob Baty and Verna Baty. In an effort to minimize confusion, this opinion henceforth refers to Bobby Baty as "Bobby Junior,"[1] and to Judy Baty, Gail Layton, Kathy Layton, Bob Baty and Verna Baty by their respective forenames.

Prior to December 16, 1989, Bob and Verna, henceforth referred to collectively as "Grantors," owned the northwest quarter of the northeast quarter in a section, township and range in Taney County.

On December 16, 1989, Grantors signed a contract with Defendants wherein Grantors agreed to convey the northwest quarter of the northwest quarter of the northeast quarter (approximately ten acres) to Defendants. That ten-acre parcel is identified on an "ownership map" prepared for the Taney County Assessor as parcel number 2. This opinion henceforth refers to the parcel as "Parcel 2."

Simultaneously, Grantors signed a contract with Plaintiffs wherein Grantors agreed to convey the southwest quarter of the northwest quarter of the northeast quarter (approximately ten acres) to Plaintiffs. That ten-acre parcel is identified on the "ownership map" as parcel number 2.03. This opinion henceforth refers to the parcel as "Parcel 2.03."

Grantors also signed a deed for Parcel 2 to Defendants and a deed for Parcel 2.03 to Plaintiffs. The lawyer who prepared the contracts and deeds ("the scrivener") explained he was to hold the deed for each parcel until the buyers of that parcel paid Grantors the purchase price.

Viewed favorably to the judgment, *T.B.G. v. C.A. G.*, 772 S.W.2d 653, 654[2]

(Mo. banc 1989), the evidence established that when the contracts and deeds were signed, the only public road providing access to the west half of the northwest quarter of the northeast quarter was Wabash Lane, an east-west road that terminated at the west boundary of Parcel 2. Two exhibits appear to show the south edge of Wabash Lane lies approximately 470 feet north of the northwest corner of Parcel 2.03.

The scrivener testified that when the documents were signed,[2] he pointed out there was no access to Parcel 2.03. The scrivener related:

"When I pointed it out, they just said 'That's no problem, don't worry about it. We don't need an easement on it'."

Sometime in 1990, Defendants decided to construct a home for themselves in the southwest quadrant of Parcel 2. Inasmuch as they had not yet paid Grantors the full purchase price, the scrivener had not yet delivered the deed for Parcel 2 to Defendants, hence Grantors remained legal owners of Parcel 2.

Although the details are sparse, this court deduces from the record that Defendants arranged to borrow funds from a bank to finance their home. As security for the loan, the bank insisted on a deed of trust covering the building site.

To meet the bank's requirement, Grantors deeded to Defendants approximately two of the ten acres of Parcel 2. The two-acre tract, henceforth referred to as "Defendants' building site," is a square with 300–foot sides in the southwest corner of Parcel 2. This court infers Defendants gave the bank a deed of trust on Defendants' building site and constructed their home there.

Grantors remained legal owners of the rest of Parcel 2.

---

1. Testifying at trial, Bobby Baty identified himself as "Bobby Baty, Junior."

2. Those present at the signing were the scrivener, Grantors, Gail and Plaintiffs. Kathy was at work. Gail took Defendants' contract to Kathy for signature, then returned it to the scrivener.

The northwest corner of Defendants' building site lies approximately 170 feet south of the south edge of Wabash Lane. Therefore, at the time Defendants obtained the bank loan, in order to reach Defendants' building site from the east terminus of Wabash Lane, one had to go south across land in Parcel 2 still owned by Grantors.

Because of that, the bank insisted on an easement from Grantors across Parcel 2 commencing at the east end of Wabash Lane and extending south to the north edge of Defendants' building site. This court gathers from the record that Grantors yielded an easement 50 feet wide, the west boundary of the easement being the west boundary of Parcel 2.[3]

Because the easement ended at the north edge of Defendants' building site, the easement did not provide Plaintiffs (or anyone else) a route across Defendants' building site to the north boundary of Parcel 2.03.

The reason Plaintiffs contracted to buy Parcel 2.03 without insisting on an easement across Parcel 2 from the east end of Wabash Lane to Parcel 2.03 was revealed in Bobby Junior's testimony. He avowed that in November 1989 (the month before the contracts were signed), a survey was made to ascertain where the boundaries of those parcels lay. After Defendants decided to buy Parcel 2 and Plaintiffs decided to buy Parcel 2.03, Bobby Junior and Gail began clearing timber and brush in Parcel 2 along its west boundary, starting at the east end of Wabash Lane and proceeding south toward what ultimately became Defendants' building site. According to Bobby Junior, "[E]ventually we had [it] opened all the way back across into my land." Bobby Junior's testimony:

"Q Did you have it pretty well cleared to where you could drive a car down to your parcel of land before the closing [December 16, 1989]?

A I don't remember if we had cleared it that far before the closing or not.

. . . .

Q Did the subject of an easement or access to your property come up [at the scrivener's office December 16, 1989]?

A Yeah.

Q And, can you tell me how it came up and what was said?

A ... [the scrivener] says 'There's not no access back here'. We'd already cut this in, and it's when we decided there was no problem, that that would be the road to all of the land, the two ten-acre parcels.

Q You said 'We decided there would be no problem'?

A Yeah.

Q Who do you mean by 'We'?

A Gail and me and mom and dad were standing right there and [the scrivener]—

Q —Was this decided amongst you at the closing, that it wasn't going to be a problem?

A Yeah, just said there would never be no problem.

Q Okay, did Gail Layton agree that there was never going to be a problem with access to this?

A Well, yeah, or I would never have signed the papers."

Photographs received in evidence at trial[4] show the route described by Bobby Junior across Parcel 2 from the east end of Wabash Lane to the north boundary of Parcel 2.03 resembles a gravel driveway. The route is referred to as "the driveway" in the transcript. This court infers from the record that the driveway lies in the easement from Wabash Lane to Defen-

---

3. The conveyance creating the easement is not in the record. This court extracts its understanding of the easement from testimony by the scrivener and Kathy.

4. Trial occurred May 27, 1998.

dants' building site and continues south across Defendants' building site to Parcel 2.03.

In 1993, Plaintiffs finished paying Grantors for Parcel 2.03, received the deed, and began constructing a home for themselves there. Bobby Junior testified construction workers and material suppliers used the driveway to travel from the east end of Wabash Lane to Parcel 2.03. After the home was finished and Plaintiffs moved in, Plaintiffs used the driveway for ingress and egress. According to Plaintiffs, this practice continued without protest by Defendants until approximately 1996. Then, according to Bobby Junior, Defendants objected. Bobby Junior's testimony:

"Q Tell me . . . what happened.

A [Gail] stopped me and told me that [Kathy had] been on him and that they always thought they'd be the end of the road, and I'd have to find another way out, and I said 'Well, there is no other way out'. I said 'Well, let me check with [the surveyor]'. So, I checked with [the surveyor]. [He] said 'There is no other way out'.

. . . .

Q Up until this time in 1996 had they ever told you you couldn't use the driveway?

A No, they never said you cannot use it."

Bobby Junior recounted that Gail ultimately "told me that he was going to have me throwed in jail for trespassing and to stay off the road."

Plaintiffs pled in the trial court that Parcel 2.03 "is landlocked" and they were entitled to "an easement by strict necessity."

The evidence revealed that when Plaintiffs and Defendants signed the contracts with Grantors (December 16, 1989), there was a "dedicated road"—North Street—that ran from south to north and ended at the south boundary of the northwest quarter of the northeast quarter of the section involved here. However, Defendants concede that when the contracts were signed, North Street "had not been constructed."

The "ownership map" referred to earlier in this opinion shows the west edge of North Street (as dedicated), if extended northward beyond its north terminus, would lie on the boundary between the east half of the northwest quarter of the northeast quarter and the west half of the northwest quarter of the northeast quarter. Thus, at its platted north terminus, the northwest corner of North Street (as dedicated) is the southeast corner of Parcel 2.03. That corner is the only point of contact between North Street (as dedicated) and Parcel 2.03. The rest of North Street, at its platted north terminus, abuts the south boundary of the east half of the northwest quarter of the northeast quarter of the section involved here. Consequently, even were North Street (as dedicated) open to traffic—a subject discussed later in this opinion—Plaintiffs could not enter the north end of North Street from Parcel 2.03 without entering the east half of the northwest quarter of the northeast quarter.

As this court comprehends the judgment, the trial court awarded Plaintiffs an easement across Parcel 2 commencing at the east end of Wabash Lane and extending south to the north edge of Defendants' building site.[5] The easement appears identical to the easement surrendered by Grantors at the bank's insistence in 1990. As noted earlier in this opinion, that easement is 50 feet wide.

The trial court also awarded Plaintiffs an easement 50 feet wide across Defendants' building site, commencing at the south end of the easement described in the preceding paragraph and extending south to the north boundary of Parcel 2.03.

Defendants' first point relied on reads:

5. This court deduces from the record that Defendants finished paying Grantors for Par-

cel 2 in 1997 and thereupon received the deed to Parcel 2.

"The trial court erred in granting Plaintiffs a common law easement over Defendants' property because the court missapplied [sic] the law in that upon conveyance by the common Grantors, Bob and Verna Baty, the common law implied an easement across land retained by Grantors to access North Street rather than across Defendants' property to access Wabash Lane."

This court's review of the trial court's judgment is governed by Rule 73.01(c), Missouri Rules of Civil Procedure (1999). In *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976), the Supreme Court of Missouri construed the predecessor of Rule 73.01(c) to mean that an appellate court will affirm a trial court's judgment unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Id.* at 32[1]. The appellate court accepts as true the evidence and inferences favorable to the judgment and disregards contrary evidence, *T.B. G.*, 772 S.W.2d at 654[2], mindful that credibility of witnesses and the weight to be given their testimony is a matter for the trial court, which is free to believe none, part, or all of any witness's testimony. *Herbert v. Harl*, 757 S.W.2d 585, 587[1] (Mo. banc 1988).

■ Defendants' first point hinges on the hypothesis that North Street provides access to the south boundary of the east half of the northwest quarter of the northeast quarter of the section involved here. When the contracts were signed December 16, 1989, Grantors owned (and retained) the tract described in the preceding sentence. Consequently, argue Defendants, "Since Plaintiffs' property cornered, but did not completely intersect with North Street, only a sliver of Grantors' property would be required by Plaintiffs [to enter the north end of North Street]."

The flaw in Defendants' position is that there was competent and substantial evidence that the segment of North Street which (as dedicated) reaches the south boundary of the tract retained by Grantors has never been constructed.

Asked at trial about North Street, the surveyor responded: "[I]t's a dedicated road, but it never has been opened to my knowledge, the portion that would abut or would have abutted Bob Baty, Senior's, property." The surveyor's testimony continued:

"Q It appears from this plat map that it appears to be heavily wooded and undeveloped territory. Is that your understanding of the nature—

A —Basically a north slope that's fairly steep in grade, yeah.

. . . .

Q To your knowledge has there been any major changes in the access to the Batys' property?

A No.

Q In your opinion is this property landlocked if it were not for the access coming down off of Wabash Lane and across the upper tract?

A Yes."

The surveyor's testimony was consistent with the following excerpt from Bob's testimony:

"Q And, do you know of any access to Bobby, Junior's, tract of land except down Wabash Lane?

A No."

Bobby Junior's testimony was in harmony with the surveyor's testimony and Bob's testimony. Bobby Junior testified:

"Q And, is there any other way to get to your house except down Wabash Lane and across the present driveway?

A No.

Q There's been some testimony about [North Street] that was technically on this plat map that comes up [from] the south. Are you familiar with that area?

A Yeah.

Q Can you drive across it?

A No.

Q Could you describe it for the Court, what it's like?

A It's all timber.

Q Is there—

A —There's no road there."

Kathy identified Defendants' Exhibit 5 as a photograph of North Street. However, her cross-examination included this:

"Q And then, Defendants' Exhibit # 5, which one is that?

A That is North Street.

Q This one north/south right here, right?

A Straight up and down.

Q And, this doesn't go right up to the Baty parcel, does it?

A No."

The testimony of the surveyor, Bob, Bobby Junior and Kathy, quoted above, supports the trial court's judgment, hence this court accepts that testimony as true. *T.B. G.*, 772 S.W.2d at 654[2]. Accordingly, this court concludes—as the trial court evidently did—that North Street (as dedicated) has not yet been built to the south boundary of the tract retained by Grantors. Consequently, the only public street Plaintiffs can reach from Parcel 2.03 is Wabash Lane via the easement awarded by the trial court.

Defendants' brief presents a scholarly discussion of easements by implication and easements by necessity; however, the thrust of the discussion is that the trial court should have awarded Plaintiffs an easement across the tract retained by Grantors, enabling Plaintiffs to reach North Street. That theory is futile because North Street (although dedicated) has not yet been built to the south boundary of the tract retained by Grantors, and there was no evidence as to when—if ever—that might occur.[6]

Neither side cites a case with facts identical to those here. However, in *King v. Jack Cooper Transport Co., Inc.*, 708 S.W.2d 194, 195 (Mo.App. W.D.1986), a landlocked party petitioned for a private road under § 228.340, RSMo 1978. The court said:

" ... Missouri law appears to afford two remedies to owners of real estate with no means of ingress or egress: (1) by the statutory method under § 228.340 or (2) by the common law easement by necessity.

... A prerequisite for common law relief is a showing the plaintiff and defendant have a common source of title to their properties. The plaintiff then would have to show a subsequent deprivation of access to a public road. In essence, the common law remedy contemplates the severance of an estate, which leaves the owner of one of the severed parcels without means of ingress or egress. The law implies an easement in favor of the landlocked parcel."

*Id.* at 196–97 (citations omitted).

The evidence in the instant case, viewed favorably to the judgment, fits the circumstances set forth in the above excerpt from *King*. This court therefore finds no merit in Defendants' first point.

■ Defendants' second point:

"Alternatively, the trial court erred in granting Plaintiffs a 50 foot easement across Defendants' property because an easement of such width was against the weight of the evidence in that a width of 50 feet is wider than the established roadway and would encroach on Defendants' use of their residence."

Defendants emphasize that Bobby Junior admitted the existing driveway is not 50 feet wide; he conceded "it's two lanes wide," about 35 feet.

6. It is unnecessary to decide whether Defendants might be entitled to have the easement nullified if North Street is eventually built to

the south boundary of the tract retained by Grantors. This opinion expresses no notion about that.

Defendants acknowledge that where an easement has been created by implication as a way of necessity without agreement as to its definite location or description, a court of equity has jurisdiction to determine the location of the servitude. *State ex rel. Hillhouse v. Hunter Raffety Elevator, Inc.*, 636 S.W.2d 400, 402[2] (Mo.App. S.D.1982). However, Defendants remind this court that the location must be reasonable as respects the rights of the servient owners. *Id.* Defendants underscore Gail's testimony that a 50–foot–wide easement across Defendants' building site would encroach on their front yard and be near their front door.

Plaintiffs respond that the easement required in 1990 by the bank across Parcel 2 from the east end of Wabash Lane to the north edge of Defendants' building site is 50 feet wide. The easement awarded Plaintiffs by the trial court from the east end of Wabash Lane to the north edge of Defendants' building site is likewise 50 feet wide and appears identical to the 1990 easement required by the bank. Defendants cite no precedent—this court knows of none—supporting the proposition that where an easement already exists, a second easement across the same route should be narrower than the first. This court therefore perceives no basis for complaint by Defendants about that part of the judgment.

The easement awarded Plaintiffs by the trial court across Defendants' building site appears to commence at the south end of the easement discussed in the preceding paragraph and extend directly south to the north boundary of Parcel 2.03. Plaintiffs point out that if the easement across Defendants' building site were narrower than 50 feet in width, there would be an "hourglass" configuration in the easement at the north edge of Defendants' building site, as the width of the easement at that point would abruptly shrink from 50 feet to 35.

Although not factually identical, *O'Brien v. Richter,* 455 S.W.2d 473 (Mo.1970), is analogous to the instant case. In *O'Brien,* the owners of the dominant estate had the right to cross the servient estate to reach a "roadway" 50 feet wide. *Id.* at 478. The roadway ended three feet from the edge of the dominant estate. *Id.* The width of the pavement in the roadway was 30.05 feet. *Id.* The Supreme Court of Missouri held the trial court properly awarded the dominant estate a roadway 50 feet wide across the servient estate to reach the existing roadway.[7] *Id.*

In the instant case, the trial court was not compelled to believe Gail's testimony that a 50–foot–wide easement across Defendants' building site would be too near Defendants' front door. *Herbert,* 757 S.W.2d at 587[1]. The trial court could have reasonably concluded from a photograph in evidence that Gail's testimony was somewhat hyperbolic.

Defendants' second point is denied, and the judgment is affirmed.

PARRISH and SHRUM, JJ., concur.

---

7. The *O'Brien* opinion explained: "[S]ince the northern protrusion of [the existing roadway] is 50 feet wide leading to the three-foot strip belonging to the [servient owners] where it joins [the dominant owners'] southern property line, it is reasonable for [the dominant owners] to lay out a 50–foot roadway and pave 30.05 feet of it on their property to their southern boundary line; and it is reasonable to allow them to continue the roadway in the same manner and width as [the existing roadway], i.e., 50 feet." *Id.*